All right, we have Middle East Broadcasting Networks v. MBI Global on Mr. Tucci. We'd be pleased to hear from you. Good morning, Your Honors. Michael Tucci on behalf of MBI Global, LLC, and with me is my co-counsel, Christy Millican. As you know from the briefing, Your Honor, this is a case about a blast-resistant building that was contracted to be built with a Louisiana company and delivered to Baghdad, Iraq, to be used as a television studio. Admittedly, Your Honors, the process was delayed, and it was delayed for a couple of reasons. One was the financial wherewithal of our client, MBI, LLC, MBI Global, LLC, and the other was the situation in Iraq. The building was to be built in Turkey and transported from Turkey to Iraq. At the time of its completion, it was, the situation with ISIS had begun and the checkpoints through Turkey into Iraq had been closed. But originally, the contract called for the building to be completed in December of 2013, and that didn't happen, and that didn't happen because of the financing of the company. The company was under a tremendous amount of stress because of the BP oil spill and was looking for investors and looking for additional capital in order to operate. It did obtain that over time, and the building was constructed over time. When it wasn't completed in December of 2013, the parties engaged in a negotiated amendment to the contract. The buyer was given $100,000 credit, and then the building was rescheduled to be done in April of 2014. What was the credit for? The credit was for, from our standpoint, the credit was given because there was a de-scoping, if you will, of the building. It called for ballistic steel in its original specifications, and it was changed to a two-ply mid-grade steel, which actually reduced the cost to build the building. I thought some of it was because, I thought from the record that it was because of delay. Well, to keep the customer happy, there certainly was a consideration, and from the company's standpoint, it was justified because of the de-scoping of the steel. They weren't going to lose any money by giving the customer this credit. Well, I thought Judge Lee found specifically that that credit, at least in part, if not in whole, was intended to offset the cost of renting alternative space. Certainly, there was a claim that there were damages being incurred by the delay as a result of renting studio space for that period of time, for the January through April. And as I understand it, the reason why that's important is because that sort of informs the question of whether or not the damages that occurred later on were within the contemplation of your client. It would if we were dealing with a consequential damages analysis. However, the district court specifically held that the damages that he awarded were direct damages and not consequential damages. And when I get to talking about the UCC, that becomes extremely important because the UCC defines. Well, let's suppose that you're right, and I'm not suggesting that you are, but you are right that this is a contract for the sale of goods, okay? Does that necessarily help you? Yes, it helps us. I mean, how so? Because under a UCC analysis, the damages, the direct damages are defined in the code as the purchase price paid minus the difference between cover and the remaining contract price. The difference between cover and remaining contract price in this case was zero. So under a UCC analysis, the direct damages are simply the purchase price that has already been paid, which is $187,000. Are we required to accept the district court's characterization of the damages as direct? Well, it is what his characterization was. I will agree that he went into an analysis that is akin to a consequential analysis, although he did that, I'll point out, incorrectly as well because under Virginia law, in which whether it's direct or consequential, I mean, if it's not controlled by the UCC, whether it's direct or consequential, we look to state common law, and the state common law says that you measure the contemplation of the parties at the time of any consensual amendment to the delivery date under the contract. That's the Roanoke Hospital case. And the consensual amendment to the contract was July 3, 2014, not back there in December or January when the negotiated $100,000 credit took place. And there's no evidence in the record that it was within the contemplation of the parties in July of 2014 that MBI Global LLC would be responsible for any rental charges. There's, in fact, evidence in the record, testimony, that it was not within the contemplation of the parties. The CEO testified that they gave them that credit. That was the only credit that they were going to give them. There was no agreement. There was no contemplation of any additional credit, even though they asked for additional credits over time. They asked for additional credits in April, and it was refused, which is certainly an indication that there was no agreement between the parties to be responsible for consequential damages. And I would say Virginia common law, as interpreted by Judge Lee in the Rogers versus Dean case, says there has to be an agreement, not just contemplation of the parties, but an agreement to be responsible for those additional costs. What do you think was the major mistake of law that the district court made? Finding that the UCC did not apply would be number one. Number two, excluding the evidence of estoppel and waiver. But why is that a question of law? Why isn't the question of whether this was a sale of goods or a sale of services? I mean, you've got, you know, factors going either way, but why is that a question of law rather than a question of just two competing views of the evidence? Well, the district court failed to engage in that analysis at all. Even though it was argued, the factors that have been set forth by this court to determine whether it is essentially a sale or essentially a service were not analyzed by the court. They weren't discussed by the court. Do you take issue with the fact that the delivery and installment of this building were highly skilled jobs? They were an essential component of the deal? They were part of the deal. They were not essential from the sale aspect because they were subcontracted to other folks. They could have been subcontracted to anybody. The installation alone was going to take 10 days, and those are skilled professionals and tradesmen that are doing it. You just wouldn't let anybody come in and install this building. And there are lots of situations where there's been an order or contract for bridges or swimming pools, and there are held contracts for services. So, you know, I'm just, why was the district court, you say this is the chief error that the district court made, but there seems to be a good, you know, a good bit of case law and evidence supporting the view that one of the reasons you wanted these people was because of delivery in one whole piece and safe delivery and competent installation? Your Honor, actually there's no evidence in the record that shows any of that because what was contracted for, what the request for proposal was for, was for a blast-resistant building. There was no consideration given to who was going to deliver the blast-resistant building. In fact, Who else was it going to be if it wasn't MBI? It was not MBI. It was subcontracted to logistics companies to deliver the MBI. But you were responsible for that, aren't you? Well, under the terms of the contract, I think probably so. I mean, aren't you responsible for the work of the subs? No, not the installation sub. There was nothing in the contract that made us responsible for that. It was to be performed, quote, unquote, by others. That's what the contract said. MEBN is not hiring the subs. You're the one that's hiring them. We hired the subs. That's right. We had a company in Baghdad to offload the building to connect it to a pad, which is bolting it to the ground, and to install the electrical and plumbing. That's it. It was a two-week operation. It was not a major part of the contract. As a matter of fact, if memory serves me, I think it was $30,000 of a $500,000 contract was for installation. Maybe it was $37,000. It was $30,000 for transport. Again, subcontracted out. And, again, not in any meaningful way a part of the intrinsic value of this contract because, in fact, the logistic company changed over time. There was no objection to that. It went from one company who couldn't get it from Turkey to Iraq to another company who, in fact, could get it from Turkey to Iraq because they were based over there. The original contract. Your view is that you owe nothing by way of damages here, isn't it? The view is we owe, if we are liable, which. When all is said and done and the dust settles, you say you don't owe a single penny. We owe them their money back if we're liable. I'm sorry. We owe them the money that they paid back. That's what the Uniform Commercial Code requires. $187,000. Well, that seems sort of an odd conclusion to me because when you look over the record of this case, the MEBN suffered repeated delays in getting this building constructed. They had to rent hotel space in order to operate. They had to go about and get a substitute contractor. And then they had to get a different kind of building with a different and lesser quality of steel. So the story here is of two years of delay and disruption from December the 13th to August 14th. But it was about a two-year delay. And in light of all the difficulties that you caused them, and in light of all your performance problems, you say you should walk away without owing a cent. That strikes me as an odd conclusion. That is the measure of damages under the Uniform Commercial Code because the cover that they selected, which we obviously had nothing to do, costs less than the remaining amount on the contract. Well, under the UCC, you can get consequential damages, right? You can. And again — Any costs resulting from general or particular requirements and the needs which the seller at the time of contracting had reason to know, which could not be reasonably be prevented by cover or otherwise. So I think there's a fairly good argument, even if the UCC applies here, that there are some consequential damages. Maybe not the whole amount that the district court awarded, but that there were consequential damages. I'm surprised that you haven't said that in response. You're absolutely right. The UCC looks at damages in two ways. One is the direct damages, and that's provided under 2715, plus any incidental or consequential damages. The reason I hadn't brought it up is because the district court found that the UCC didn't apply and that the damages — And they should have known about what the defendant knew or should have known about the plaintiff's rental and security needs well before the contract was last amended in July 2014. Those findings stand. They go to a — They're there in the record, and they would support an award of consequential damages to a certain extent. I don't disagree with that. All right. So then it seems to me that if you are right, if you're wrong on liability, but right that the UCC applies, they get the direct damages, and they get consequential damages to a certain point. Beginning at a certain point and ending at a certain point, correct. All right. Well, let's talk about ending. Where do you think those consequential damages would end? December 15, 2014. Because? Because that was the date that the substitute building by contract should have been completed, and it wasn't. And anything that occurred after December 15, 2014, was not proximately caused by MBI's breach. Well, of course, your whole argument to us is that this situation in the Middle East is so fraught that the other side should have known there would have been delays, that that was just kind of part of the game. I mean, you started out your argument about how this was. So in getting the substitute, wouldn't that also be the part of the game for them? Well, the substitute wasn't transporting a building. I understand that, but they were building it there, right? They were building it in Baghdad. Baghdad was not. In the spot that you wanted, in the spot that was originally contracted. Actually, the problem was transporting between Turkey and Baghdad. The problem wasn't in Baghdad. The problem was at the checkpoints and at Mosul. I think the record is very unclear what the problem was, because your people kept saying different things. Well, not after December. We weren't involved after December 15, 2014. But when you were contracting and when there was this delay, there were problems everywhere, and there were photographs of the module, and then where were those photographs taken? It was all very – you're more familiar with the record than I am, right? I think so. Yeah. Well, do you remember that? I do. I do. Just to follow up on that, you take this view that after December of 2014. 15. 14. 14? Yeah, I thought it was 14. After December 2, 2014, that all the rest of the damage was Al Sear's and the substitute contractor's fault. That's correct. That's basically your view of it. But, you know, the point is made, I think, by the appellants, that not every intervening cause, and Al Sear here would be the intervening cause, is necessarily a superseding cause for purposes of consequential damages. And it seemed to me that all the subsequent problems, such as they may or may not have been with Al Sear and the substitute contractors, which, by the way, was for a very inferior building, they were still proximately caused by your breach. Everything that happened here, even if they're always intervening causes in consequential damages law, but everything that happened here can trace back, in terms of proximate causation, to your screw-ups. And that's what brought on this whole parade of problems. And, you know, district courts, this was a bench trial. District courts get some latitude in assessing damages. And, you know, the justice of it doesn't bother me if we don't cut it off in December 2014 because I think the problems that were experienced after December 2014 were ultimately traceable to you from the very beginning. They had to go to all kinds of trouble because you weren't performing. And that was the nub of the case in the eyes of the district court. And, you know, and it was a bench trial here. And so I just really couldn't believe it, that you were coming up here and saying after all the, you know, everything you put them through, that you weren't liable for a red cent. It just didn't compute to me. Well, as I've stated, we didn't say that we're not liable for a red cent. We were liable for the direct damages under the UCC plus any consequential damages that could properly be awarded. And after December 15th of 2014, the line of proximate causation was cut off because you basically had a defaulting contractor at that point. And you can't be charged. The chain of causation was broken by the default of another unrelated party. The only cases that have addressed that particular issue have said those are superseding causes. The U-bolt case in Delaware is the best example of that. I don't know why the district court wouldn't be allowed to find, because the question of causation is not one or all or nothing. The question of causation is probably one of degree. And I don't see why this was an impermissible finding of causation. It wasn't a finding at all. All right. The burden of proven causation is on the plaintiff. You've got some rebuttal time, and we're going to give that. So let's go into this on rebuttal, okay? All right. Thank you, Your Honor. Mr. Grenier. Good morning, Your Honors. Peter Grenier on behalf of the appellee. I'm going to refer to them as MBN, and I apologize with MBN versus MBI, but MBN is Middle East Broadcast Networks. What initials? What acronym are you using? Well, MBN for. Why don't you call yourself the network? The network.  I'll do my best, Your Honor. It's been years of calling them MBN. I'll do my best. With me at counsel's table is the general counsel and corporate representative of the network, Ann Noble. Your Honor, I want to start by correcting a gross misstatement by my opposing counsel with the first question asked by Your Honor. If we look at. You're going to have to tell me what that is. Yes. I'm sorry. This is with respect to the purpose, the specific purpose behind the $100,000 credit in the January 2014 contract with the First Amendment. And you need not take my word or counsel's word. It's on the face of the black letter of the contract, the First Amendment at Joint Appendix 607. And here's what it says. It says, MBI, the defendant, shall provide client, the network, with a credit not to exceed $100,000 representing the cost to client, the network, of expenses related to the delay in the schedule. Right. That's what it says. Yeah, but I think that the court was aware of that. Okay. Just because counsel stood up and said it had to do with de-scoping and a change in the quality of the steel. Well, then he said that's why they did it. But the reason why you got it. Yes. I mean, you know, he said what he said. And, in fact, Phil Moore, their president during the time of the contract, the president of MBI, acknowledged that MBI knew that the rent was continuing and accruing and that's what the $100,000 represented. And, in fact, Your Honor, I'll tell you that with respect to that $100,000 credit, it turns out, I learned in discovery, that the reason they were so willing to give that was because they ended up, they, MBI, got a cheaper version of steel and they actually ended up not losing much money at all in giving that $100,000 credit. Right. Now, I'd also like to just jump to one of the last questions. Before you move on, let me. I'm sorry. Is that the amendment that we're talking about with respect to the notion that they were on full notice of any future consequential damages arising from delay? Well, Your Honor, I would say partially yes, but I could, prior to, when the contract was entered into originally in October of 2013, absolutely, and Phil Moore, the designee of the defendant, appellant to MBI, he acknowledged that they knew that they had to evacuate their space. So they had to move out of their space at the end of 2013. So they knew, I would suggest, Your Honor, they even knew at the time of the original contract, and that was why the completion had to be by December 2013. And, in fact, it wasn't until mid to late December 2013 that MBI even told the network that there were delays, and they even misrepresented the delays of, they said, four to five weeks, and that was a falsehood. It was falsehood after falsehood after falsehood, and as Your Honors hopefully could glean from this record, it was essentially a Ponzi scheme, taking money from the new client to try to pay back the subcontractors that were still owed for previous clients. And, in fact, Mr. Tucci acknowledged that they were in some dire financial straits at the time. Similarly, in January 2014, and more responsive to Your Honor's question, yes, in January 2014, when they entered into the First Amendment, from which I just read, they certainly knew that rent was accruing. So if that's true, does it really matter whether or not this is a contract for services and or goods, since under the UCC it seems you'd be entitled to your consequential damages? I think it does, Your Honor, and I'll tell you why. Because somewhat puzzlingly, the cost of the original contract was $510,000 before the $100,000 credit. The, I'll say, compromised substitute, which was the brick and mortar construction by Al Soar in late 2014 into 2015, only cost $125,000. The other thing I would say, Your Honor, is it's important because, remember, my client paid $187,000 as a down payment, which I think no one disputes is owed back to them. But they never got the benefit of that $100,000 credit. Now, one could say, well, if we give the consequential damages of the rent, that basically covers the $100,000. But it really doesn't, because the $100,000 was for the first few months of 2014, and that was contemplated by the First Amendment to the contract. And then we have continuing direct or consequential damages, and I'll get into a discussion of direct versus consequential. So I think, to answer Your Honor's question, I think there is a distinction to be made. And I should say that it's black-letter law, and this Court has stated that the tax ---- Are these questions of damages? Are these, in your opinion, are these matters of law, or are they questions of fact? Well, I think they're all questions of fact. And, in fact, I was just going to ---- Well, the determination of what standard applies has got to be a question of law. Well, no, but I'm sorry. How could that be a question of fact? I'm sorry, Your Honor. What I was going to say was that the taxonomy of the contract, the classification of the contract, is a mixed question of law and fact. And, in fact ---- Whether the UCC applies or not is a question of law, right? Well, Your Honor ---- Applying it may be a mixed question, but determining where you start has to be a question of law. Okay. I'm sorry if I seem to be playing semantics with you, Your Honor. I certainly don't mean to, but ---- I would like to see some authority for saying determining whether the UCC applies or not is a question of fact. Well, I will tell you, for example, I can tell you, Your Honor, that when the first contract was written and they wrote it and there were their terms, they had Louisiana law applying, and Louisiana is the only State in this union that does not use ---- But you threw that out. That's not in it anymore. I know. I'm saying Article II does not apply under Louisiana law. Okay. But I'm not ---- Determination. Okay. So that's a question of law, of Louisiana law. Sure. So it's a question of law. I agree. And I'm sorry that I'm not ---- But an analysis under the UCC. Okay. Okay. And I'm sorry. I slightly misspoke, and I apologize. But under the UCC, this Court has held in Coakley and Williams that the taxonomy of the contract, whether it's primarily for services, is a factual one subject to review only under a clearly erroneous standard. And as Your Honor has already, I think, acknowledged, the trial ---- it was a bench trial. So the trial court got to hear all the evidence and make a determination of those facts. And simply because this Court is convinced that maybe you would have decided the case differently and would have found that it's predominantly for goods rather than services, you may not reverse the trial court findings because it has to be ---- The underlying primary facts are questions of facts, but the conclusion to be drawn from them ---- Yes, Your Honor. ---- is a question of law. I'm sorry. The conclusion as to whether the UCC applies is a question of law. But in reaching that question of law, there are underlying facts that need to be found. I think we could say that that way, Your Honor. I almost would say it kind of in the converse. I mean, we have the UCC, so we have to deal with the UCC. So let's say the trial court is presented, and by the way, this is an argument that they presented not at the 11th hour but at the 12th hour. They never peeped a word about the UCC until the day of trial. What difference does it make? Well, and we looked back at their answer to our amended complaint to determine whether or not they had properly asserted affirmative defenses. And candidly, they only had an affirmative defense that talked about a failure to mitigate damages. Application of the correct law is not an affirmative defense. I think if you could answer Judge Wilkinson's, I think his last question was, what difference does it make whether the UCC applies or not? It doesn't matter. But when we determine the taxonomy, the classification of the contract itself, we find that it's not governed by Article II of the UCC because it was predominantly for services. And that's what the trial court found. That's not the answer to the question. The question being asked is how does it matter to the bottom line here in terms of the judgment if, in fact, the damage analysis appears to be the same with respect to consequential damage? I don't think it – I think in a high percentage of the damages, I think that it doesn't matter. But where I think it does matter. Okay. Right, right. We're trying to get there. Sure. I'm sorry, Your Honor. Where I think it does matter are several things. One, if we do a calculation based on what Mr. Tucci suggests, we have that differential between the $125,000 for the Al-Sor contract and we have the contract, the original contract, which was for $510,000. So it seems to me that under a UCC analysis, there would arguably be a greater offset to the damages. Was there some failure to cover here on the part of Mebane? And we don't think – no, we do not think it was a failure to cover. All right. Well, why don't you think – why do you think there was no failure to cover? Well, first of all, I think we're – again, I think we're looking at it through the wrong lenses. What we think – I think we should be looking – the lens we should be looking at it through is we know that there's a duty to mitigate by the network. And the question is, was that mitigation effort with Al-Sor, was that reasonable? It's an affirmative defense, failure to mitigate. So it was their burden of proof to prove that we did not reasonably mitigate our damages, the network. And so – So are you saying cover and mitigation are essentially the same? No, I'm not saying that at all. I'm not saying that at all because they cite the case involving Plywood for cover. This is not, as Your Honor pointed out, this is not a case where they could cover by saying, you know what, we're going to call another blast-resistant building manufacturer and have them bring over a building and install it. There are no such manufacturers in Iraq. And what they had to do was they ended up really – I thought cover referred to the notion of where you've got similar goods. Yes. What are you saying? There is no similar goods. That's what I'm saying. Your Honor. It seems to me pretty much establishes that this is a good and not a surface issue. A la UCC. I respectfully disagree. Let's just say, all right, that this is a contract for the sale of goods. Cover refers to getting similar goods. In my mind, the cover and mitigation are related concepts, and they have a certain overlap, but they're not entirely the same. And it seems to me that the question here is given what you were faced with and what I think is kind of an amalgam contract for goods and services. I mean, we've been pushed to try to define it as one or the other, and I think it has elements of both. But if cover refers to getting similar goods, part of the question has to be, did you make reasonable efforts to mitigate? And you're saying, yeah, we did make reasonable efforts to mitigate. We got a substitute contract. We had a separate design for a different building, which would apparently have put MBI on the hook for less, because ultimately you had a separate design and a different building. But in the whole effort in getting our SOAR and in vetting our SOAR and getting the substitute building, your point of view is that this was not only reasonable, it was necessary to even get modestly competent performance. And I think those damage calculations bottom out considerably to the same thing, whether the UCC applies or not. It gets down to the point of what damages you caused  And that's where I think the case begins to assume more of a factual coloration at that point. And so when we get down into the calculation of damages and questions of mitigation, that seems to me more factual in content. And we're dealing with here sort of kind of a contract. It's a mixed bag. It has elements of both, but perhaps the preponderance of the elements point to a sale of goods. I respectfully disagree with that last point, Your Honor, because a blast-resistant building manufactured in Turkey or Louisiana or anywhere on earth sitting there was of absolutely no use to the network unless it was transported, which it was, as the trial court acknowledged. But transportation is of no use to you without the building. I don't know where that argument proves. I understand. I understand. But there was a $473,000. The thing about it is all goods involve shipment. Right. But that doesn't bring it out. The fact that all goods involve, you know, sending the goods. I understand, Your Honor. Unless you go by and pick them up at the plant, which doesn't help happen all that much. So, you know, the point I keep trying to get at is that I don't you could concede something on that question and still say it doesn't make one doggone bit of difference. Well, I think I would agree. As Judge Motz pointed out, certainly the UCC does contemplate the consequential damages. Absolutely. But the fact that you are resisting this so much indicates to me that you must think that there is a different total amount of damages that would be awarded under the UCC than not. And maybe you can address that argument. Well, I mean, hearing, candidly hearing the Court speak as it is speaking today, perhaps there's not. And if there's not, then certainly I have absolutely no problem with the Court affirming the amount of damages while finding that in fact it's. Okay. Well, there's no promise by the Court that that's what it's doing. So that's, you know. I understand. You were here maybe during the first argument. Maybe you would attack or address those things that you think would be least recoverable under the UCC or more recoverable under the common law. Certainly, Your Honor. And I think it's important, by the way, whether it be a UCC or a common law analysis, that the consequential damages provision was deleted as part of the First Amendment. So I think that that probably does put it more on even ground with the UCC by virtue of that amendment, certainly. Well, in a question where you have a contract with both installment elements and the sale for goods, the ultimate question is, in this case, after this bench trial, was justice achieved? And there does seem to me, and I don't want to go over it again, but given all that you were put through, and given the fact that, and it's sort of different from your typical sale of, it's a different kind of contract from your typical sale of goods, which involve multiple items, you know, rather than one constructed prefab building, that a lot of what you were put through, the delays, the hotel quarters, the lesser building you got, and the fact that you had to get a sub and vet the sub, and all this stuff that you were put through because of their behavior, to say that the district court didn't correctly award damages because some of these might be caused as consequential, when the proximate causation, or when causation is linked as it is here so firmly to MBI's breach, you come back to the ultimate question, was there really an injustice done here? Or did the district court, by and large, come to a just conclusion? That is ultimately where we stand. Given the magnitude of the breach and the trouble you were put through, which the district court recognized, totally recognized, was there an injustice done? I would say absolutely. The only injustice done was by MBI through the network. Tell me why. I'm sorry. Just tell me, why was justice done in this case? Why was justice done? Yes. Oh, absolutely. Well, Your Honor, it's calculable down to the penny as far as what, as a proximate result from all of the breaches by MBI. There were multiple breaches. Multiple and repeated breaches coupled with misrepresentations. And, candidly, we talked about whether we should introduce fraud and fraudulent misrepresentation, fraud in the inducement. But you don't have any tort claims, do you? No, absolutely not. So we kept it. Usually, when we have tort claims, we're thinking about burden and injury that you suffered in that way. But here we have a contract claim. Sure. So the contract that you ultimately entered into with the substitute person cost you less than the contract you had with them, right? True. So shouldn't they get that small amount of difference after deducting all your expenses, I think it's about $50,000. It's talked about in the brief. You don't address it very much. I just don't really think there's much question about that. I disagree with Your Honor's, and I'll tell you why. How would you get that money? Well, I'll tell you why. If not, we're not, no tort. I understand. Only a contract. I understand. We were entitled to the benefit of our contract, and we never got that. What we had to do was we had to build an inferior product to get something. This is a taxpayer money funded from the United States government grant. So did the district court make that finding, that that's the basis for this $50,000? No, no. No. I think what the court found. And did you enter evidence about that? About the taxpayer funding? No, about how you got, you're entitled to the $50,000, even though it wouldn't seem if you put the new contract against all of your expenses and the old contract, that you wouldn't be entitled to it. Did you have an argument with respect to that? I believe we did introduce evidence that this was a brick and mortar construction that was inferior in quality. That's not responsive to my question. Well, it's. I mean, it's always worthwhile to answer the question while you have a chance than letting the other person come up with whatever they're taking. I understand, Your Honor. But if you don't have an answer to it, okay. I understand. And my premise, though, is it would. Your premise is you're entitled to everything that was given. I understand that. I take issue with this being called cover because it's not. I didn't call it cover. Okay. I told you what I was thinking. I understand. I just take issue with it being called cover, which is a UCC term, because it was not something even in the same stratosphere of comparability as far as safety is concerned. A blast-resistant building in the middle of a war zone versus a brick and mortar construction. Okay. Which is clearly services. Thank you very much. Thank you. Counsel, you have some rebuttal time. Thank you, Your Honor. I'm always loath to tell lawyers how to address their argument. But if you have an argument that is less than we don't owe any of these damages, I would suggest that this is the time to make it. Well, Your Honor, I think we conceded at. You know what I'm talking about. You've heard the dialogue. If the court is right that consequential damages apply in this case, we believe that they start under the law of this circuit in the Roanoke Hospital case, they start July 3, 2014. We also believe that they end December 15, 2014. And I'd like to get back to that with the colloquy that we were having when my time was up, and that is that proximate cause analysis. You have to understand what's going on here. We built a BRB in Turkey, tried to get it into Iraq, into a war zone, and were successful in getting it there in 15 months. What happened after that, the choice of cover, it was totally the network's choice to go out and get Al Sur. Al Sur was contracted in October of 2014 and delivered the building in November of 2015. It took a contractor 13 months on site, a Baghdad-based contractor, to build this supposedly inferior building, a difference of two months. Now, we've been made out to be engaged in misrepresentation, multiple breaches, but what about Al Sur? Al Sur, the chosen contractor who agreed to build that building by December, didn't build it by December. They then agreed to build it by April of 2014 and obviously didn't build it by April of 2014. There were multiple breaches of contract by Al Sur, we believe. We don't know that because we never got any of the documents that we were entitled to in discovery. That's factual, isn't it? I'm sorry? That is factual. It is factual, but the district court never engaged in an approximate cause analysis. It only looked at whether the attempt at mitigation was reasonable. That's the only thing, and those are entirely different things. The choice to go to Al Sur to build this building as the substitute building may have been reasonable in October, may have been a reasonable mitigation effort in October of 2014, but that doesn't have anything to do with the proximate cause. The proximate cause for the losses that were alleged after December 15th was something that Al Sur did or something that the network did, and the only testimony in the record would be some detailed look into the proximate cause of this when the whole reason they had to deal with Al Sur and get an inferior building was because you messed up. That's but-for causation, not proximate causation. Well, no, it seems to me it's foreseeable that if you messed up they were going to have to go and get something done by somebody else elsewhere, and it might not be the same that they had contracted for. We're not talking about whether it's the same or not. We're talking about the delay. The whole question about consequential damages, I understand the UCC skepticism toward them, even though I'm contracting for three boxes of apples, and you don't want to stymie commerce and contractual relations by opening up sellers of goods to all kinds of consequential damages. But, you know, this is one of those things that doesn't seem to me all one way or all the other, but perhaps a few more arrows point in the direction perhaps of it being a sale of goods. I'm willing to agree with that, but it still is not a standard kind of thing where the skepticism about consequential damages would necessarily apply. My response is whether they apply or not, they still have to be proximately caused by the breach, and there is no case that I have seen in this country that finds the original breaching party liable for additional costs caused by a subsequently breaching party. And here that's what we have. Al Suhr breached its contract. That's not MBI's responsibility. It is Al Suhr's responsibility. If the network incurred damages as a result of the substitute building being delayed, they need to look to Al Suhr for those damages, not MBI. Thank you. All right. Thank you. We will come down in Greek Council and take a brief recess.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Albert Diaz